U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

## ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed August 24, 2012**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ARJEN WILHELMUS PETRUS GEIJSEL | § | CASE NO. 10-43979-11 |
| and KIMBERLY KAY GEIJSEL, | § | CASE NO. 10-43980-11 |
| THE LUCKIE DUTCHMAN, LLC, | § | |
| | § | |
| DEBTORS. | § | **Jointly Administered Under** |
| | | **Case No. 10-43979-11** |

## <u>MEMORANDUM OPINION</u>

Lone Star, FLCA and Lone Star, PCA are the sole remaining creditors objecting to the

*Second Amended Joint Plan of Reorganization* (as modified), filed and submitted for

confirmation by debtors Arjen Wilhelmus Petrus Geijsel and Kimberly Kay Geijsel and debtor

The Luckie Dutchman, LLC. The Geijsels, individually and through their wholly owned limited

liability company, The Luckie Dutchman, LLC, own and operate a dairy; they—the Geijsels and

The Luckie Dutchman, LLC—filed separate petitions for relief under chapter 11 of the

Bankruptcy Code (11 U.S.C.) on June 15, 2010. The two cases are jointly administered under

Case No. 10-43979-rfn-11. For purposes of this Memorandum Opinion, Arjen and Kimberly

Geijsel will be referred to as the "**Geijsels**," and The Luckie Dutchman, LLC will be referred to as the "**LLC**." The Geijsels and the LLC will collectively be referred to as "**the Debtors**." Lone Star, FLCA will be referred to as "**FLCA**," and Lone Star, PCA will be referred to as "**PCA**"; they will collectively be referred to as "**Lone Star**." The *Second Amended Joint Plan of Reorganization* (as modified) will be referred to as the "**Plan**." The Official Unsecured Creditors Committee, which supports the Plan, will be referred to as the "**Committee.**"

The Court considers whether to approve confirmation of the Debtors' Plan over Lone Star's objections. Resolution of the confirmation dispute effectively resolves other matters before the Court, specifically Lone Star's motion seeking relief from the automatic stay [Docket No. 183], Lone Star's motion to appoint a chapter 11 Trustee or, alternatively, to dismiss the cases [Docket No. 304], the Debtors' motion to determine the value of Lone Star's secured claims [Docket No. 433], and the Debtors' motion to designate Lone Star's votes [Docket No. 578].

The undersigned judge was appointed in April 2011 to hear Lone Star's then pending stay motion and motion to appoint a chapter 11 trustee or to dismiss, when the presiding judge, Judge Nelms, was out ill. These motions were tried over ten days, from April 25, 2011 to August 12, 2011. By August 12, 2011, the parties had completed their presentation of evidence. As the Debtors were then prepared to go forward with confirmation of their plan (as originally filed), and given that the major issue on the other pending motions concerned the Debtors' ability to propose a confirmable plan, the motions were suspended by the Court's order of August 19, 2011. The confirmation hearing then proceeded for eleven days, spanning approximately five

months. The Plan, along with the other motions, was taken under advisement in early March, 2012.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## I. Facts

1. These bankruptcy cases arise from the failed financial relationship between the Geijsels and Lone Star. The Geijsels and the LLC filed their chapter 11 petitions after they unsuccessfully attempted to restructure their debts with Lone Star through Lone Star's in-house restructuring opportunity. Since the petition date, the Debtors have continued their dairy business as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

2. The Geijsels have eight outstanding loans with Lone Star, described as follows:

| Loan No. | Date | Loan Amount |
|----------|------|-------------|
| 858175 | March 17, 2006 | $350,000 |
| 477730 | July 18, 2006 | $150,000 |
| 259100277 | August 31, 2006 | $95,000 |
| 259100383 | February 15, 2008 | $163,100 |
| 876408 | February 15, 2008 | $2,838,000 |
| 885689 | April 8, 2009 | $1,450,000 |
| 259100177 | November 30, 2009 | $2,800,000 |
| 259100178 | November 30, 2009 | $2,237,000 |

*See* Lone Star's Exhibits 1-10. The loans are each evidenced by a promissory note and secured by deeds of trust and security agreements, all now owned and held by Lone Star. *See* Lone Star's Exhibits 11-49, 111-115. The loans are secured by virtually all of the real and personal property owned by the Debtors. In particular, Lone Star's collateral includes all livestock, feed, milk, and

accounts receivable, including periodic milk checks from the Debtors' sale of milk, and proceeds from the sale of cows and bulls. The real property (and improvements) that secures the loans are a 77-acre heifer ranch and the 626.7-acre dairy facility. The Geijsels hold title to the 77-acre heifer ranch; the LLC holds the title to the dairy facility. The liens and security interests securing the loans are, for purposes of confirmation, assumed to be properly perfected, first priority liens and security interests. One or more of the notes evidencing the loans was renewed or extended from time to time. All of the loans are cross-collateralized and contain cross-default provisions.

3. The Geijsels are liable on all eight notes and are owners of most of the collateral securing the loans. The LLC is liable on the note evidencing Loan No. 885689 in the amount of $1,450,000 and, as stated, holds title to the 626.7-acre dairy facility. At the time of their bankruptcy filing, the total indebtedness of the Geijsels to Lone Star, including Loan No. 885689, was approximately $9.8 million.

4. Prior to filing for bankruptcy protection, the Debtors defaulted on their loans with Lone Star. As of June 14, 2010, the day before the petition date, the loans were still in default, either under the terms of the loan documents pertaining to each specific loan or by virtue of the cross-default provisions in the loan documents.

**A. The Plan**

5. The Plan, as is relevant here, provides that allowed administrative claims (*see* § 503 of the Bankruptcy Code), designated as Class 1, are paid in full upon the later of the effective date of the Plan or entry of an order allowing the claim; provided, if an administrative claim was incurred in the ordinary course of business by the Debtors, the Debtors may pay such claim in the ordinary course going forward. In either event, the Plan provides that the Debtors may pay an

administrative claim upon such other terms as the Debtors and the holder of the administrative claim may agree upon.

6. With respect to the Debtors' secured creditors, Classes 2 - 11, the Plan generally provides that each class will be paid in full, the Debtors submitting that, with respect to each class, the creditor is paid the present value of its secured claim in light of the term and interest rate provided and given the nature of the collateral held by each claimant. With the exception of Lone Star, whose claims are consolidated into two classes (Class 2 and Class 3), all other secured creditors have either affirmatively voted for and accepted the Plan or have not lodged an objection to the Plan.

7. The Plan specifies that priority creditors (*see* § 507 of the Bankruptcy Code), Class 12 and Class 13, are either paid in deferred cash payments with interest at 12%, or in cash upon the later of the effective date or entry of an order allowing the claim. The Court is not aware of actual claimants within these two classes, however.

8. The Plan has separated unsecured creditors into two classes, Class 14 and Class 15. Class 14 consists of unsecured creditors of $1,500 or less and states that they will be paid "pro-rata their allowed claim" upon sixty days from the effective date of the Plan or the allowance of the claim, whichever is later. The Court understands such treatment means the Debtors will pay such claims in full despite the language of the Plan stating they are paid pro rata. Unsecured claims in excess of $1,500, Class 15, shall bear interest at prime and are payable over sixty months in equal monthly installments. They are likewise to be paid in full.

9. Lone Star filed three proofs of claim: a claim by PCA in the Geijsels' case as a secured claim for approximately $5.317 million; a claim by FLCA in the Geijsels' case as a secured

claim for approximately $4.571 million; a claim by FLCA in the LLC case as a secured claim in the approximate amount of $1.463 million. The Plan consolidates Lone Star's three claims into two claims, one for PCA and one for FLCA. In effect, FLCA's claim filed in the LLC case (Loan No. 885689 for $1,450,000) is included with FLCA's claim filed in the Geijsels' case. The LLC and the Geijsels are joint obligors on this debt; the dairy facility, which is owned by the LLC (and which was subject of a separate lawsuit),[1] serves as the primary collateral for this debt. FLCA is restricted to one recovery for this obligation.

10. PCA is designated as the Class 2 secured creditor, in the approximate amount of $5.2 million, secured by cattle, milk proceeds, feed, and equipment. The Plan proposes that it be paid in full in deferred cash payments, bearing interest at 5.44%, with payments based on a 120-month amortization and a balloon payment in the 85th month. Payments begin on the sixtieth day after the effective date of the Plan or thirty days after entry of an order allowing the claim, whichever comes last. The Plan specifically provides that the Debtors reserve the right to object to the allowance of the claim of PCA; it also specifies that certain covenants shall apply to the claim.

11. The claim of FLCA is designated as the Class 3 creditor in the approximate amount of $4.6 million, secured by the Debtors' real property. It will be paid in full, in deferred cash payments, bearing interest at 5.44%, with the payments based on a thirty-year amortization with a balloon payment for the balance due in the 241st month. The payments begin on the sixtieth day after the effective date of the Plan or thirty days after entry of an order allowing the claim,

---

[1] *See infra* note 7.

whichever comes last. As with the PCA claim, the Debtors reserve the right to object to the FLCA claim.

12. With respect to both Lone Star claims, Class 2 and Class 3, the Plan provides that "[a]ll payments shall be applied first to the payment of the obligation secured by the Debtors' homestead" and that the "pre-petition cross-collateralization" of Lone Star's liens shall not be affected except to the extent that it covers the 200-acre homestead at issue in the homestead litigation.[2] The Plan specifically provides that the Debtors "will not pay any attorney's fees or other allowable claims under 11 U.S.C. § 506 or the loan documents because the claim or claims are not oversecured." It prohibits Lone Star from participating in any other class.

13. Relevant to the treatment of Lone Star is the treatment of the remaining secured creditor, Black Tulip, LLC ("Black Tulip"). Black Tulip is designated as Class 4. Black Tulip has a claim in the amount of $603,000, secured by a deed of trust lien on the dairy facility that is inferior to the lien of Lone Star. The Plan provides that its claim will be paid over 240 months, with interest at prime plus one. It further provides that any arrearage owed to Black Tulip will be cured as of the effective date of the Plan.

14. Under the Plan, it is projected that the monthly payments will be $53,627 per month to PCA, $22,679 per month to FLCA, and $3,736 per month to Black Tulip.

15. The Plan is funded by the continued operation of the Debtors' dairy and income from property of the Debtors. The Plan states that the Debtors anticipate their monthly gross income will need to "reach $655,000.00 with a net profit, before taxes and depreciation, of $96,100.00." The Plan states that the Debtors believe they can reach such revenue figures within one to three

---

[2]*See infra* note 7.

months of the effective date, assuming they are milking at least 1,750 cows, they are able to complete the "free stalls" and thus achieve a milking herd of between 1,750 and 1,950, and that milk and feed prices remain at anticipated levels.

16. The Plan contemplates that the Debtors will have over $1 million in cash on hand at the time of implementation of the Plan.

17. By the Plan, the Geijsels basically retain all assets, including their ownership of the LLC. Arjen Geijsel will receive a salary of $7,500 per month, and Kimberly Geijsel will receive a salary of $2,500 per month. The Plan does not contemplate a rental or other payment made by the Geijsels to the LLC for the dairy facility.

**B. Lone Star and Lone Star's Claims**

18. While the Court refers to PCA and FLCA collectively as Lone Star, they are separate, affiliated entities. PCA is a federally chartered "production credit association" that is authorized to make short and intermediate term loans. FLCA is a federally chartered "federal land bank association" that is authorized to make real estate mortgage loans with maturities of not less than five years nor more than forty years. Both PCA and FLCA are subsidiaries of Lone Star Land Bank, ACA, which is, in turn, affiliated with the Farm Credit Bank of Texas and was chartered by the Farm Credit Administration in accordance with the Farm Credit Act of 1971.

19. The proof of claim filed by PCA in the Geijsels' case states on its face an amount owing as of the petition date, June 15, 2010, of $5,311,604.38; that it is fully secured by collateral of a value of $7,437,460.00. *See* Debtor's Exhibit 7-A. An attachment to the proof of claim provides that the claim amount is the total amount owing under four notes, including a note referred to as the "cow note" with a balance of approximately $2.88 million and a note that

served as the operating line of credit with a balance of approximately $2.2 million. The claim also includes $56,000 in attorneys' fees of which approximately $3,500 was incurred as of the petition date and the balance representing the amount incurred through September 30, 2010. The attachment further explains that the $7,437,460 "estimated" value of the collateral is a value as of August 16, 2010, but that the estimated value as of the petition date, June 15, 2010, was $9,865,975. The proof of claim states that Lone Star reserves the right to amend the collateral value as well as the claim amount to include additional interest, costs, and attorneys' fees incurred as a result of the bankruptcy case.

20. The proof of claim filed by FLCA in the Geijsels' case states on its face an amount owing as of the petition date of $4,571,018.10; that it is fully secured by collateral with a value of $7,437,460. Debtors' Exhibit 7-B. This claim arises from four notes, the two largest having balances of approximately $2.695 million and $1.407 million,[3] respectively. It makes the same claim concerning attorneys' fees as does the PCA claim. Also like the PCA claim, this proof of claim states that the estimated value of collateral as of the petition date is $9,865,975, but that the $7,437,460 estimated amount is the estimated value as of August 16, 2010. FLCA's claim reserves in Lone Star the right to amend the collateral value as well as the claim amount to include interest, costs, and attorneys' fees incurred as a result of the bankruptcy case.

21. The third proof of claim is filed by FLCA in the LLC case. This claim is a fully secured claim in the amount of $1,463,359.62. Debtors' Exhibit 7-C. This debt arises from a single note that was cosigned by the Geijsels and is the same note as the one referenced above in the amount of $1.407 million. (The balance amount is higher in the LLC case as the proof of

---

[3]This represents the asserted balance on Loan No. 885689, for which the original loan amount was $1,450,000.

claim includes attorneys' fees and expenses of $56,018.04, which is also included in the FLCA proof of claim in the Geijsels' case. As the proofs of claim state, Lone Star cannot collect the fees and expenses twice.)

22. The FLCA debts are primarily secured by the Debtors' real property and the PCA debts are primarily secured by the Debtors' personal property. Regardless, all the notes are cross-collateralized across the two debtors and the two lenders. The total indebtedness claimed by Lone Star as of the bankruptcy filing is $9,774,086.90.[4]

23. The $1.407 million note referenced above (Loan No. 885689) is secured by a deed of trust lien on the dairy facility. The Geijsels sued Lone Star regarding this note and deed of trust, asserting that Lone Star's lien is an invalid lien on a portion of the dairy facility that the Geijsels contend constitutes their homestead.[5] The other collateral securing Lone Star's loans are the Geijsels' cows, accounts receivable, inventory, capital retains, equipment and machinery, and a 77-acre heifer ranch.

24. As of the petition date, the value of the personal property collateral securing Lone Star's debt was $4,665,313.26. The value of the cows was $3,628,905.00, Lone Star's Exhibit 97; the value of the equipment was $497,119.00, Lone Star's Exhibit 100; the value of the inventory was $41,367.00, Lone Star's Exhibit 97. This personal property collateral includes cash on hand at filing of $26,474.53 and accounts receivable of $471,447.72. Debtors' Exhibit

---

[4]This total indebtedness is based on Lone Star's three proofs of claim and the aggregate of PCA's and FLCA's claims (but not counting twice the cosigned note with a balance of $1.407 million); it includes total fees and expenses claimed to the petition date of $3,500.50 and thus subtracts from each claim the $52,517.54 of fees and expenses incurred *after* filing.

[5]*See infra* note 7.

48. The value of the real estate collateral securing Lone Star's debt as of the petition date was $3,930,000.00—$3,380,000 for the 626.7-acre dairy facility and $550,000 for the heifer ranch.

25. Other assets include capital retains (which the Debtors value at $259,000) and building materials valued at $250,000. The evidence is unclear on whether the capital retains and building materials secure Lone Star's claim. The Court assumes they are covered by Lone Star's liens, however. The evidence is inconclusive regarding whether such items contribute any significant, realizable value to Lone Star's collateral position.

26. The cash on hand, which is critical to the Plan, reached a high amount of $1.144 million in April 2011; by the end of January 2012, it was $579,130.76. *See* Monthly Operating Reports for April 2011 and January 2012 [Docket Nos. 412 and 755]. The accounts receivable, as an immediate cash item, are likewise important to the Plan and to a proper assessment of Lone Star's claims. The value attributed to accounts receivable at any point in time is derived from the *collected* receivables for the following month. For example, the Debtors' *collected* receivables in June 2010, the month of filing, was $471,447.72, which is the value of the accounts receivable *as of the filing date*.

27. The total value, therefore, of all collateral securing Lone Star was, as of the petition date, $8,595,313.26.

**C. The Debtors' Pro Formas**

28. The Debtors' pro formas submitted in support of confirmation are projections that cover a seven-year period, running from June 2011 to May 2018. *See* Debtors' Exhibit 14. As evident, the time period covered by the pro formas overlapped with the confirmation hearing, which began August 29, 2011. The pro formas assume the Debtors have total cows of 2,200 with

1,900 milking cows. They assume a flat milk price throughout the seven years of $19/cwt.[6] They also assume a 35% cull rate. They contemplate an average gain of pounds per cow per day of 66 pounds (actually, a range of 61 pounds to 69 pounds).

29. The monthly cash flows, net of operating expenses, are projected to be positive every month of the seven-year period. After distributions to creditors are made in accordance with the Plan, the "revised" cash flow, i.e., net of Plan payments, remains positive for all but the first few months of the Plan period. The pro formas also assume that, as of the time payments begin under the Plan, the Debtors will have $1.1 million of cash on hand.

30. The amortization of Lone Star's claims as treated under the Plan is set forth in the pro formas. They provide that the PCA claim of $5.235 million is paid $56,660.03 per month and the FLCA claim of $4.6 million is paid $26,001.79 per month. *See* Debtors' Exhibit 14-C. The seven-year balloon payment on the PCA claim is projected to be $1,829,951.29; the twenty-year balloon payment on the FLCA claim is projected to be $2,387,364.03. *Id*.

### D. The Geijsels and the LLC

31. The Geijsels acquired the 626.7-acre dairy facility in February of 2008. They financed the purchase of the dairy with an approximate $2.8 million loan from Lone Star and a $600,000 loan from the seller Black Tulip. Lone Star and Black Tulip each took a deed of trust lien on the facility, with Black Tulip subordinating its lien to Lone Star. The Geijsels spent an additional $550,000 on the dairy and, in doing so, increased the milking capacity of the facility. They began operations at the facility in May of 2008, with a transition period running to July 2008. They had been running their dairy operations from two other locations. The milking

---

[6]The designation "/cwt" refers to "per hundred weight."

capacity and the quality of the milk was, according to the Geijsels, adversely affected in the short run by the move.

32. The Geijsels had previous borrowings from Lone Star, including for the purchase of the 77-acre heifer ranch where they conducted a heifer raising operation. The Geijsels have not purchased any heifers since the summer of 2008, however.

33. The LLC was formed in May of 2008. Arjen Geijsel testified that it was created as a means to avoid personal liability from employees being involved in automobile accidents. He said, therefore, that he simply had the LLC as a place to "park" a few vehicles that were used in connection with the dairy. It was not created as the entity through which the dairy operations were to be conducted, he said. Geijsel was, at best, disingenuous in this testimony. The LLC was formed because the Geijsels were, at the time, in need of cash to pay their vendors and the only way they could raise the needed funds was by having the dairy placed in the LLC so Lone Star would make another loan against the dairy. In this regard, the Geijsels, in April 2009, conveyed the 626.7-acre dairy to the LLC. Lone Star loaned the LLC $1.450 million (Loan No. 885689) for the LLC's purchase and took a deed of trust lien to secure the loan.

34. The dairy was transferred to the LLC to avoid the Geijsels' potential homestead claim against a portion of the 626.7-acre dairy facility. In drawing this conclusion, the Court is not commenting on the validity of the transaction. The Geijsels were represented by counsel in the transaction; Lone Star's knowledge of the Geijsels' circumstance at the time will be resolved in the related adversary proceeding, Adversary No. 11-04009.[7]

---

[7]The Court has recently learned that the adversary proceeding has been resolved by a compromise settlement agreement reached between the Geijsels and Lone Star. Such agreement was approved by the Honorable Russell F. Nelms. Concerning the dispute regarding the Geijsels' homestead claim, the Court notes that the purchase money debt against the 626.7-acre dairy facility, which is not in dispute, is approximately $3.42 million against a value, according

35. After the LLC acquired the 626.7-acre dairy facility, the Geijsels, at least in accordance with their financials, carried on the entirety of their operations through the LLC. They continued to do so during the bankruptcy as reflected in the monthly operating reports filed regularly in the bankruptcy proceedings. This is not consistent with the Plan and the Geijsels' position as expressed during the confirmation proceedings that the dairy is, in effect, their sole proprietorship.

36. The Debtors' Disclosure Statement described the relationship between the Geijsels and the LLC as follows:

> The ownership of the two . . . Debtors are inextricably intertwined and the assets used by the two . . . Debtors as well as the liabilities of the two . . . Debtors are setup in such a way that it is difficult to determine . . . the obligors and guarantors of each separate obligation. It appears that at least some of the equipment used at the dairy may have been purchased and/or leased by Geijsel, who does business as Wilhelmus Dairy and The Luckie Dutchman, LLC and in other capacities, the Geijsel's [*sic*] individually, used credit to borrow large sums of money to purchase equipment and acquire services, some of which debt has been repaid by one or the other of the two . . . Debtors, creating a situation where legal ownership is in one entity, including a Geijsel entity.

Debtors' Exhibit 3-C at 10-11. Arjen Geijsel testified that the "operations" of the LLC and the Geijsels individually are "combined" for purposes of funding their chapter 11 Plan; their counsel stated that they operate as "one economic unit."

37. The Court does not doubt that the Geijsels view themselves as owners of the dairy, whether titled in their names personally or in the LLC. But the formation of a separate legal entity and its ownership of the major asset does have legal ramifications that are not entirely consistent with the Geijsels' current position that the dairy is their sole proprietorship. The

---

to Lone Star's expert, of $3.38 million. The additional Lone Star debt arising from the LLC's purchase of the dairy in the spring of 2009 is approximately $1.4 million.

Geijsels' creation of the LLC and its use simply creates problems with their contention that Lone Star duped them into moving the dairy into the newly formed LLC as a way to obtain a loan from Lone Star. Lone Star contends that the Geijsels' confused use of the LLC—on one hand reflecting all operations through the LLC, while on the other hand taking the position here that the LLC is of no real effect—is evidence of their lack of good faith. The Court agrees that it is such evidence but, on balance, fails to appreciate any real prejudice to Lone Star.

38. All of Lone Star's notes, whether held by FLCA or PCA, and whether with the Geijsels or the LLC, are cross-collateralized. The Court cannot discern, therefore, how the confusion and ambiguity created by the Geijsels regarding their operations has prejudiced Lone Star. The Court notes that no other creditors have raised an issue regarding the Plan and the premised structure and framework of the Debtors' operations. The LLC is wholly owned by the Geijsels. The dairy facility is titled in the LLC. The Geijsels own the cows, equipment, feed inventory, and the 77-acre heifer facility; the employees are employed by the dairy facility. The LLC and the Geijsels together operate under the name "Wilhelmus Dairy." The Geijsels, in effect, operate the dairy as a sole proprietorship, though the main facility is owned by the LLC. There is no formal accommodation, i.e., a lease of the dairy facility by the LLC to the Geijsels.

### E. Other Relevant Facts

39. During the majority of the pendency of these bankruptcy cases, the Debtors have paid $35,000 per month for professional fees. This includes fees and expenses for the Debtors' counsel, accountants, experts, and counsel for the Committee.[8] Under the Plan and as set forth in

---

[8]As of the date of this Memorandum Opinion, it appears upon a review of the Court's docket that the Debtors' counsel has requested fees and expenses of $884,449.83 and has had approved payment of fees and expenses of $696,008.33, subject to final review. [Docket Nos. 98, 133, 233, 413, 644, and 845]. Counsel for the Committee has requested and payments have been authorized, subject to final review, for fees and expenses of $487,574.82. [Docket

the pro formas, the Geijsels will continue to pay the $35,000 per month payments post-confirmation until all approved professional fees are paid. In addition, immediately upon filing of the case, an interim "cash collateral" order was entered, which, with other interim orders, culminated in the Final Agreed Cash Collateral order entered in September 15, 2010, that provided for $50,000 per month adequate protection payments to Lone Star. All adequate protection payments have been made through June 2012.

40. In the fall of 2008, the Geijsels began the construction of "free stalls," which are covered but open buildings that provide a cooler (shaded) and more comfortable area for the cows. The use of free stalls helps make the dairy cows more productive. The problem, however, is that the Geijsels used operating funds from their operating line of credit with Lone Star to construct the free stalls. This in part caused them to run short of funds needed for the regular operating expenses of the dairy. They spent approximately $1 million in constructing the free stalls. When Lone Star learned of this, it advised the Geijsels that it was improper to use the operating line for such purpose. Despite this, the Geijsels, again in 2010, diverted funds for the continued construction of free stalls. The Plan contemplates the construction of additional free stalls.

41. The price of milk has increased significantly from its low point in 2008 - 2009 when it was in the $10/cwt range to the present where it has about doubled. During the pendency of the bankruptcy case, it has gone from $16/cwt to $21/cwt. In addition, the Debtors' milk production has increased since the filing of the bankruptcy case.

---

Nos. 669, 812]. The Debtors' accountants, Genske, Mulder & Company, LLP, have requested and have had payments authorized for fees and expenses of $88,766.41. [Docket Nos. 182, 272, 470, and 672]. The Debtors' expert, Dr. Allyn B. Needham, has requested fees of $29,890.00 and has had payments authorized of $25,515.00. [Docket Nos. 712, 769].

42. During the summer of 2011, particularly from May through July 2011, due to the drought, the Debtors' feed costs were significantly higher than projected. This resulted in a negative cash flow for such months. *See* Debtors' Exhibit 10-B. The Debtors made the $50,000 per month adequate protection payments and advanced the professional fees of $35,000 per month during each of these months.

43. The Debtors have not sold any "excess" heifers during the pendency of the bankruptcy, though their Plan contemplates the sale of additional heifers as a means to generate income.

44. Arjen Geijsel's testimony regarding the condition of the dairy equipment was not helpful. He said that he did not maintain a log of hours of usage for the larger items of equipment. The Geijsels presented no evidence to support a claim that the equipment was in good condition and, more important, would remain in good condition and thus not significantly decline in value during the payout period on Lone Star's debt.

45. The Debtors' Plan and their financial projections in support of the Plan assume 66 pounds of production by each cow. The Debtors have not historically maintained 66 pounds of production on any consistent basis. Their average in 2010 was 63 pounds.

46. The projections assume a cull rate of 35%, the proceeds of which help fund the Plan. The Debtors have not historically maintained a cull rate as high as 35%. Their historical cull rate is approximately 27%. The Court accepts the historical rate as the more accurate and efficient rate, i.e., the rate at which the Debtors truly need to "cull" cows from the herd. The Debtors contend that their 35% cull rate is a "conservative" projection, implying that if they continue to cull cows at the lower, historical rates, their income will actually be greater. In effect, cows keep

producing and generating revenue. An eight-point difference, however, is not insignificant, and neither the Debtors nor their expert fully explained why they chose a rate that is significantly higher than what they have ever done. The Court infers that their higher cull rate inflates their income projections.

47. Arjen Geijsel testified that in May or June of 2008 he had spoken with RABO Bank and Bank of the West concerning a loan to refinance the debt they then had with Lone Star. The Debtors have not had discussions with any lenders since then concerning refinancing of the Lone Star debt.

48. Arjen Geijsel testified that the Debtors have approximately $90,000 in claims arising from goods sold to them in connection with their business that were delivered to them within twenty days of their bankruptcy filing. These give rise to § 503(b)(9) claims, which, under §§ 1129(a)(9)(A) and 507(a)(2) of the Bankruptcy Code, must be paid in full upon the effective date of the Plan. A review of the Court's docket reflects that $98,751.06 in such claims have been allowed. *See* Docket Nos. 164 and 496.

49. The dairy business and market is highly volatile. As with most agriculturally related enterprises, it is influenced by the weather. The best months typically begin in February and run through the spring. Because of the heat, the summer months are the lowest producing months. The drought in Texas during 2011 had an adverse effect on the Geijsels' operations. Production was down, as is typical, but feed costs also rose. They were therefore impacted on both sides of the ledger.

50. If the Plan is not confirmed and the Debtors' assets are liquidated in an orderly fashion, there is no dispute but that Lone Star will be the only creditor that gets paid. It is

anticipated that Lone Star would not be paid in full and unsecured creditors would realize no recovery.

51. As set forth above, Black Tulip is classified as a secured creditor behind Lone Star. It is paid a variable rate of interest at a rate of prime plus one. Arjen Geijsel testified that he did not know the arrearage amount owed to Black Tulip. The Plan, as stated, provides that Black Tulip's arrearage amount will be "cured" on the effective date of the Plan, which is 60 days after confirmation.

52. By May 2011, the Debtors had accumulated cash of approximately $1.1 million. This represents accumulated cash at the beginning of the month after payment of operating expenses, including the $50,000 monthly adequate protection payment and $35,000 monthly reserve for professional fees. Arjen Geijsel testified that they needed such amount "as a cushion." Their cash flow projections, premised upon a $1 million cash position at the time the Plan is launched, state that they will have accumulated $1.5 million by the end of their first year under the Plan. *See* Debtors' Exhibit 14-C.

53. As of September 30, 2011, Lone Star had incurred attorneys' fees and expenses in connection with the bankruptcy cases of $725,892.69; it had incurred fees and expenses in connection with the adversary proceeding regarding the homestead dispute of $322,725.74. *See* Lone Star's Exhibit 275.

54. As stated, the Plan and pro formas anticipated the $1.1 million "cushion" at the time Plan payments begin. The Debtors do not have such amount, however. As reflected in the monthly operating reports, they had such amount in April, 2011, which was mostly maintained through August 2011. Beginning in September 2011, however, the available cash on hand as

measured at the end of the month has declined. At the end of January 2012, it was $579,130.76; it increased to $683,013.43 in February 2012 and then dropped each month thereafter. The June 2012 operating report reflected cash on hand of $276,442.21.

55. The Plan and the pro formas contemplate that the Debtors' milking herd will increase from 1,750 head to 1,950 head. The cattle inventory has declined, however. *See* Order [Docket No. 759]. The Debtors will not be able to achieve the projected number of milking cows.

## II. Discussion

### A. Requirements for Confirmation—§§ 1129(a), 1129(b)

A bankruptcy court must approve confirmation of a plan that meets the requirements of § 1129(a) of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a). Alternatively, if the requirement of acceptance by all impaired classes—§ 1129(a)(8)—is not met, confirmation can still be achieved if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims . . . that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b).

Lone Star's objections address both the requirements of § 1129(a) and the standard for confirmation as to a dissenting creditor under § 1129(b) of the Code. Lone Star submits that the Debtors failed to comply with other "applicable provisions" of the Code, § 1129(a)(2); that the Plan is not proposed in good faith, § 1129(a)(3); that the continuation of the Geijsels as sole members/managers of the LLC's operation is not consistent with the interests of creditors, § 1129(a)(5); and that the Plan is not feasible, § 1129(a)(11). As to § 1129(b) of the Code, Lone Star argues that the Plan cannot be "crammed down" over its objection because the Plan discriminates unfairly against Lone Star and is not fair and equitable in its treatment of Lone Star. As to the fair and equitable standard, Lone Star contends that both the payout terms and the

interest rate fail to accord Lone Star the present value of its secured claims as required by § 1129(b)(2)(A)(i).[9]

The Court, in assessing whether the confirmation requirements of § 1129(a) and the cramdown standard of § 1129(b) have been met, addresses the specific objections of Lone Star. As for the requirements of § 1129(a) *not* raised by Lone Star, the Court concludes, without discussion, all such requirements are satisfied, or, in some instances, are not applicable here.

Addressing Lone Star's objections, the Court focuses on the two § 1129(a) requirements of good faith and feasibility and the fair and equitable standard of § 1129(b). These are the substantive issues before the Court. Lone Star did not point to any evidence to support its objections that the Debtors failed to comply with the applicable provisions of Title 11, the § 1129(a)(2) objection. The leading treatise on bankruptcy law, *Collier on Bankruptcy*, explains that the courts are somewhat split regarding the meaning of this requirement: whether it refers to essentially *all* provisions of Title 11 or just those provisions that relate specifically to the reorganization process, such as the disclosure and solicitation provisions at §§ 1125 and 1126, respectively. *See* 7 *Collier on Bankruptcy* ¶ 1129.02[2] (Alan N. Resnick & Henry J. Sommer,

---

[9]Section 1129(b)(2)(A) provides as follows:
> For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> (A) With respect to a class of secured claims, the plan provides--
> > (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
> > (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.
> 11 U.S.C. § 1129(b)(2)(A).

eds., 16th ed. 2011). Regardless, the Plan and the confirmation proceedings have not raised an issue of significance regarding this requirement.

Lone Star's § 1129(a)(5) objection—that the continuance of the Geijsels as managers of the LLC is not in the best interest of creditors—arises out of the homestead dispute between the parties. Lone Star contends that the Geijsels, by making the homestead claim against a portion of the 626.7-acre dairy facility, are, in effect, attempting to divest the LLC of a valuable asset to the detriment of its (the LLC's) creditors. This dispute has been settled and, besides, the Court has concluded that the confusion regarding the Debtors' operations—as between the Geijsels personally and the LLC—does not prejudice Lone Star. No other creditors have raised this issue.

The feasibility requirement of § 1129(a)(11) and the fair and equitable standard of § 1129(b) are, given the circumstances here, necessarily conflated. This becomes apparent upon analysis. The Court first addresses Lone Star's contention that the Plan has not been proposed in good faith, followed by a discussion of the feasibility requirement. Then, to fully evaluate feasibility and whether the Plan's treatment of Lone Star satisfies the fair and equitable standard of § 1129(b), the Court must assess and define Lone Star's claim.

### 1. Good Faith

Good faith has different requirements throughout the Bankruptcy Code. *See* Edith H. Jones, *The "Good Faith" Requirement in Bankruptcy*, 1988 Ann. Surv. Bankr. L. 2, 5 (1988). A bankruptcy court reviews the circumstances surrounding the filing and the behavior of the debtor during the course of the bankruptcy proceedings to determine if the *filing* was made in good faith. *See id.* at 8. Filing motivations typically found to lack good faith include avoiding other judgments, litigation, or foreclosure; or circumventing, for example, obligations under a contract

or bond. *See id.* at 3-4. In contrast, a good faith evaluation of a proposed plan requires an

evaluation of the plan itself. *In re Tex. Extrusion Corp.*, 68 B.R. 712, 723 (N.D. Tex. 1986).

> The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start. Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.

*In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) (internal citations omitted). The

sitting bankruptcy judge is in the "best position to assess the good faith of the parties'

proposals." *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984).

The good faith requirement serves to guard against "abuses of the system." *Cf. In re*

*Bashas' Inc.*, 437 B.R. 874, 911 (Bankr. D. Ariz. 2010) (concluding, under its § 1129(a)(3)

analysis, that "[t]he court is always alert for abuses of the system"); *see In re Ferch*, 333 B.R.

781, 785 (Bankr. W.D. Tex. 2005) ("Good faith under 11 U.S.C. § 1129(a)(3) is not a state of

mind."). A proposed plan is not lacking good faith simply because it is not the plan the creditors

desire or would have proposed. *See id.* (holding plan not lacking good faith where repayment is

made with company stock); *see also In re Alta+Cast, LLC*, No. 02-12982, 2004 WL 484881, at

*3-4 (Bankr. D. Del. Mar. 2, 2004) (finding plan not lacking good faith where subordinate

claims not paid; the plan was consistent with other plans of limited resources); *see also Bashas'*

*Inc.*, 437 B.R. at 911 (changing implementation methods prior to confirmation does not

constitute a lack of good faith).

A plan proposed in good faith must have reorganization as its honest and legitimate

purpose. *See In re Block Shim Dev. Co.–Irving*, 118 B.R. 450, 455-56 (N.D. Tex. 1990). The

court considers circumstances surrounding the plan to assess the "subjective motive" of debtors

and plan proponents. *See id.* (applying clearly erroneous review standard to find an honest

reorganization purpose over claim that the real purpose was to reorganize ownership interests).

Courts do not consider pre-petition actions when assessing the good faith of a proposed plan. *See*

*Tex. Extrusion*, 68 B.R. at 723.[10] Pre-petition actions are immaterial to whether the proposed plan

is consistent with the objectives of the Bankruptcy Code and the likelihood of the plan's success.

*See id.* (finding that allegations regarding pre-petition violations of antitrust law had no impact

on assessing the good faith of the proposed chapter 11 plan). Additionally, certain post-petition

actions of the debtor may be discounted by the court when evaluating whether a plan has been

proposed in good faith. *See* Richard M. Cieri, *et al.*, *"The Long and Winding Road": The*

*Standards to Confirm a Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Part*

*I)*, 3 J. BANKR. L. & PRAC. 3, 37 (1993) (discussing debtors' actions that the Fifth Circuit has

declined to find lacking good faith, including the following: decreasing other partner's

ownership interests, using cramdown, discounting payments to creditor, and including terms

inconsistent with prior agreed order in proposed plan); *see also In re Vill. at Camp Bowie I, L.P.*,

454 B.R. 702, 709 (Bankr. N.D. Tex. 2011) (applying § 1129(a)(3) good faith analysis to

determine that artificial impairment of a class is not a per se failure of good faith).

     Lone Star contends the Plan has not been proposed in good faith because it has no

realistic hope of success. This argument goes to feasibility, as well. Among the points made are

the following: the Plan and the pro formas assume milk production that is higher than can be

justified historically, they project feed costs that are lower than current feed costs, they anticipate

a higher herd count than presently exists, and they assume beginning cash of $1.1 million

---

[10]Even when challenging the legality of the proposed plan under § 1129(a)(3), this court refused to look to acts or evidence prior to the filing of bankruptcy. *See Tex. Extrusion Corp.*, 68 B.R. at 723.

(which, at present, is approximately a third of that amount). Lone Star also contends that the confusion caused by the Debtors' mix of operations between the Geijsels personally and the LLC is likewise an example of how the Plan is not proposed in good faith.

Lone Star's good faith objection is based, in essence, on their aggregation of all things they say are wrong with the Plan. While this may, upon a liberal construction of the statutory provision, implicate the good faith requirement, such issues are more properly addressed under the feasibility requirement. The Plan is not facially unconfirmable; on balance, it represents a legitimate and honest attempt to reorganize. Its potential success was, upon filing, within a realm of reasonableness. The concept of the Plan—the restructuring of its major secured debt by extending the payment terms, lowering the interest rates, and employing balloon payments—is not uncommon or novel. The desire to continue operations and to essentially retain all assets by the Geijsels is understandable. The Geijsels are literally fighting for their livelihood. The Plan has been submitted in good faith.

### 2. Feasibility

The Court's overarching goal in assessing a plan's feasibility is to determine whether the debtor has shown, by a preponderance of the evidence, "the existence of a reasonable possibility that a successful rehabilitation . . . can be accomplished within a reasonable period of time." *See, e.g., In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 110 (Bankr. W.D. Tex. 1987). A rehabilitation plan is successful when a debtor's plan is "not likely to be followed by . . . liquidation, or the need for further financial reorganization." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 172 (5th Cir. 2011) (quoting 11 U.S.C. § 1129(a)(11)). The success of a debtor's plan "need not be guaranteed," *In re M & S Assocs., Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992), but should have a "reasonable assurance of commercial viability."

*Save Our Springs*, 632 F.3d at 172 (citing *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1166 (5th Cir. 1993)); *see also In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *In re Arts Dairy, LLC*, 432 B.R. 712, 716-717 (Bankr. N.D. Ohio 2010) ("Debtors emerging from a Chapter 11 case are, by definition, attempting to overcome difficult financial circumstances."). Courts should closely scrutinize plans that are more "visionary" than they are realistic, pragmatic approaches to the debtor's financial problems. *See, e.g., In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 479 (Bankr. S.D. Ohio 2011). Still, a plan may be approved despite having a "marginal prospect of success" if the secured creditor is fully protected in the event of the plan's failure. *See Briscoe Enters.*, 994 F.2d at 1166. A feasible plan does not, however, "shelter the Debtors from the inevitable." *Anderson Oaks*, 77 B.R. at 111.

Courts should consider contingencies and risks, but need not dwell on the best and worst contingencies. *See T-H New Orleans*, 116 F.3d at 802 ("Debtors are not required to view business and economic prospects in the worst possible light.").

Courts have employed the following factors in determining whether a plan is feasible: the debtor's capital structure, the earning power of the business, economic conditions, the ability of debtor's management, the probability of continuation of management, and any other related matter. *See, e.g., In re Mortg. Inv. Co. of El Paso, Tex.*, 111 B.R. 604, 611 n.8 (Bankr. W.D. Tex. 1990). This is a loose test; a court can weigh (or indeed ignore) various factors at its discretion. *See, e.g., In re Landing Assocs., Ltd.*, 157 B.R. 791, 819 (Bankr. W.D. Tex. 1993). The factors, not surprisingly, bunch together and are easily confused and conflated with each other. Indeed, courts do not typically "check off" factors and need not consider all the factors in their decisions. *See In re Am. Solar King Corp.*, 90 B.R. 808, 832-33 (Bankr. W.D. Tex. 1988) (courts do not

- 26 -

need to "check off" factors); *see also Save Our Springs*, 632 F.3d at 173 (court did not need to analyze each of the six factors in finding the plan infeasible).

The debtor's capital structure

Courts, understandably, look favorably on debtors with available capital. Though courts do not need to assume the worst, they should be wary of a plan in which "virtually all of the income" goes to paying off the plan without a "sufficient buffer"[11] to weather economic storms. *Compare M & S Assocs.*, 138 B.R. at 851 (citing *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989) ("When virtually all of the income generated from the property 'is required to satisfy the debtor's obligation under the plan, it is difficult to conceive of how a plan could be feasible under the Code.'")), *with In re Adamson Co., Inc.*, 42 B.R. 169, 176 (Bankr. E.D. Va. 1984) ("[Debtor's] cash, while currently being used to reduce interest expense, is available to the debtors and provides a fund by which the administrative expenses of the bankruptcy proceedings may be paid as well as serving as a sufficient buffer for any transitional cash requirements that the debtors may have in commencing operations under a confirmed plan."). This is especially true when the debtor needs to literally weather the weather and/or is in a volatile industry like the dairy business. *Compare In re Holthoff*, 58 B.R. 216, 220-21 (Bankr. E.D. Ark. 1985) ("The debtors have accumulated a huge debt far beyond their ability to pay even assuming fortuitous weather and a substantial increase in commodity prices in the future."), *with In re Martin*, 66 B.R. 921, 928 (Bankr. D. Mont. 1986) ("Thus, [a government agricultural insurance program for a dairy debtor] will provide stability of income in the future against abnormal weather and catastrophic conditions."); *In re Wiersma*, 324 B.R. 92, 114 (B.A.P. 9th Cir. 2005) ("There was also no evidence to show that [the debtor] could weather a period of

---

[11] *In re Adamson Co., Inc.*, 42 B.R. 169, 176 (Bankr. E.D. Va. 1984).

underachievement or any large-scale problems with the new dairy, new employees, or new cows.").

<u>The earnings power of the business</u>

A court should consider "concrete" and not "speculative" projections of a business. *See M & S Assocs.*, 138 B.R. at 849 (citing *In re Sound Radio, Inc.*, 103 B.R. 521, 524 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990)) ("Income projections offered in support of reorganization plans 'must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic.'"). Still, as the court will be considering projections, some degree of speculation is involved. So, it is an overstatement to say that a debtor cannot speculate, but any speculation must be grounded in "financial realit[y]." *M & S Assocs.*, 138 B.R. at 851.

One way to assess the reliability and soundness of a debtor's projections is to use the period of the case as a test-run, and to see if the debtor has, indeed, been able to meet its projections. *See T-H New Orleans*, 116 F.3d at 802 (debtors meeting projections during case was sign of feasibility). If so, it alleviates much of the court's concerns. *See In re Monnier Bros.*, 755 F.2d 1336, 1341-42 (8th Cir. 1985) (it was a good sign of feasibility that debtors had been operating "within the bounds" of their projections); *see also In re Wolf*, 61 B.R. 1010, 1012 (Bankr. N.D. Iowa 1986) ("The feasibility of the debtor's projections is also corroborated by the debtor's performance during the proceedings in this court."). If debtors have not been meeting their projections, they need a legitimate, fixable excuse. *See In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 430 (Bankr. W.D. Mo. 2009) ("Debtor may not have met its projections for the first three months, during one of the worst recessions this country has seen since the Great Depression, but it has shown progress in its second quarter."). Still, courts should be wary of debtors manipulating their projections by presenting a "moving target," that is, adjusting their

projections or morphing them in a way that suggests gamesmanship. *See In re Nw. Timberline Enters., Inc.*, 348 B.R. 412, 426-427 (Bankr. N.D. Tex. 2006) (debtors' projections were amorphous and were difficult to tie to financial statements). *But see In re Way Apartments, D.T.*, 201 B.R. 444, 453 (N.D. Tex. 1996) (debtor modified plan to pay creditors from a two-year period to a seven-year period and plan was confirmed). Courts can also weigh a debtor's ability to make adequate protection payments during the case, especially if the adequate protection amount is close to what debtors would pay under the plan. *See In re Bastankhah*, No. 10-40058, 2012 Bankr. LEXIS 256, at *5 (Bankr. S.D. Tex. Jan. 18, 2012) ("The Court further notes that the Debtors have been timely making adequate protection payments to Banco during the case in an amount that is close to the proposed monthly payment amount under the Plan.").

A court should determine if the debtor is on the path to recovery by doing better during the case than they were prior to filing bankruptcy. *See In re Haukos Farms, Inc.*, 68 B.R. 428, 436 (Bankr. D. Minn. 1986) ("Accordingly, it appears that even accepting the Debtor's value and debt figures, the Debtor is in a worse financial position currently than it was at filing. It is highly unlikely that the Debtor's operation has the present, inherent capability of funding a 100 percent plan or that it could reasonably expect to have that capability in the foreseeable future."). If a debtor remains stagnant but projects a substantial improvement in its numbers, then the debtor needs to convince the court in a substantive, detailed way why the future will be different. *See In re Bryant*, 439 B.R. 724, 738-739 (Bankr. E.D. Ark. 2010) (debtor predicting increased crop revenues convinced court he could do so with recently acquired additional labor and land).

Economic conditions and ability of management

Courts should ascertain the "root cause" of the filing and determine (1) whether it was the debtor's fault, and (2) whether it is gone or likely to be gone soon. *See In re Am. Family Enters.*, 256 B.R. 377, 404-405 (D.N.J. 2000).

If it was the debtor's fault, then this is understandably not a good sign. Poor management is not likely to become good management. However, if the bankruptcy is caused by outside contingencies, such as a fragile economy, then the root cause contingency might go away.

Still, for the second step—whether the "root cause" will in fact dissipate—courts may, to some degree, have to predict the debtor's future behavior. Though courts will accept rosy or dire predictions if they are supported by ample facts, courts have understandably been hesitant to get too creative or bold with predicting uncertain markets, especially, for example, the milk market. *Compare Landing Assocs.*, 157 B.R. at 819 (court found optimistic predictions for occupancy rate of apartment building was sound where apartment building was only apartment building near a large military base), *with In re Yett*, No. 02-03054, 2003 Bankr. LEXIS 2250, at *20-22 (Bankr. D. Idaho Apr. 2, 2003) ("The problem, of course, is using a temporal snapshot [of the time of the case] to evaluate the overall feasibility of the Plan. Historical milk prices, as represented . . . , cover quite a range. . . . It is certainly possible that milk prices will not improve or, if they do, may suffer at some point a downward trend rendering Debtors unable to make the payments called for by the Plan.").[12] It is, therefore, not standard to accept a plan that assumes a dramatic swing in prices or market conditions. *See Haukos Farms*, 68 B.R. at 437 ("A

---

[12]In this passage, the court was addressing creditor's arguments that milk prices, which were down during the pendency of the case, rendering debtor unable to meet its projections, would stay down. Despite the court's open acceptance of the basic randomness of milk prices, the court approved the plan because the creditor had sufficient remedies in the event of the debtor not being able to meet its payments.

Bankruptcy Court cannot order the price of grain to rise; nor can it enjoin against further decline in the value of farm land. Not surprisingly, where the plight of a debtor is largely the result of a hostile economy, appropriate effective judicial remedy in Chapter 11 to the debtor's condition is often severely limited; and in many cases, is entirely unavailable."). The exception to this rule is if the court determines that the financial conditions will improve simply due to odds against, say, a 100-year recession reoccurring. *See Am. Trailer & Storage*, 419 B.R. at 430 (court found that "worst recession[] this country has seen since the Great Depression" would not continue to affect debtor's trailer business in the upcoming years to the point it did that led to the filing); *see also In re Retzlaff*, 64 B.R. 137, 138-40 (Bankr. N.D. Iowa 1986) (adverse weather conditions which led to debtor's filing were not likely to continue).

Other related matters

This category is a catch-all and can hypothetically encompass any number of circumstances that may arise in a particular case. Courts have considered factors such as the blessing or lack of blessing by the U.S. Trustee,[13] or whether there is negative amortization in the plan.[14]

An oft-repeated concern (already somewhat addressed in the above discussion concerning the importance of the debtor's capital structure) is how much of a "cushion" the debtors have. *See M & S Assocs.*, 138 B.R. at 849 ("The availability of credit, both capital and trade, the adequacy of funds for equipment replacement, and provisions for adequate working capital are other factors which should be examined [in a feasibility analysis]."). The desire for a

---

[13]*Compare Yett*, 2003 Bankr. LEXIS 2250, at *20-22 (trustee recommended confirmation), *with Northwest Timberline*, 348 B.R. at 429 (court took trustee's silence and antipathy towards the case as suggesting trustee did not recommend confirmation).

[14]A repeat offender for unconfirmed plans. *See M & S Assocs.*, 138 B.R. at 850-51; *In re Gen. Electrodynamics Corp.*, 368 B.R. 543 (Bankr. N.D. Tex. 2007).

"cushion" is driven by the desire to protect creditors from entering into a non-consensual risky relationship with a bankrupt debtor who is promising to do better a second time around. This is especially pertinent when the plan contemplates large balloon payments.

Some courts, in addressing balloon payments, have taken the position that balloon payments are themselves feasible only if the court is satisfied that there will be either: (1) a successful sale to a likely or known buyer, or (2) the ability of the debtor to obtain refinancing from a likely or known refinancier. *See In re Briscoe Enters., Ltd.*, 138 B.R. 795, 805-806 (N.D. Tex. 1992). Additionally, courts consider several factors in assessing the viability of a plan with a major balloon payment. They include future earnings capacity of the debtor, whether the plan provides for payment of principal and interest to the secured creditor, the motivation of the debtor to execute the plan successfully, the equity in the property, and whether the plan provides for the reduction of debt to enhance the prospect of refinancing at the end of the plan. *See, e.g., Bastankhah*, 2012 Bankr. LEXIS 256, at *6-7.

Courts are concerned with using performance measures to determine whether a debtor can meet its monthly payments in a way that essentially apes the standard feasibility analysis, up until the time of the balloon payment, so that the proposed balloon payment will, indeed, be what the plan contemplates and not more. Then, a court should consider the most important question: whether the creditor's security, in some form, will outweigh its owed, proposed debt at the time of the balloon payment. *See Briscoe Enters.*, 994 F.2d at 1169.[15] Specifically, the court should

---

[15]The court in *Briscoe Enterprises* stated as follows:

> Heartland [the creditor] and the district court suggest that allowing a balloon payment is unacceptable as there is no immediate indication from where the funds will come to pay off the balloon… It is reasonable to assume that the property itself will provide the source for the balloon payment. There is no evidence that the property will decline in value. Therefore, when the balloon is due, either the property will be sold which will provide the balloon or refinancing will be possible.

consider whether the debtor will have sufficient equity to attract a refinancier or, if not, whether the debtor can sell the property and fully pay-off the secured creditor. *See T-H New Orleans*, 116 F.3d at 802[16] ("The Plan included several alternatives which could reasonably result in the full payment of FSA's claim; for example, by refinancing, a balloon payment at the end of twenty-four months, [or] the sale of the Hotel to a third party."); *see also Trenton Ridge*, 461 B.R. at 494 (quoting *F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.)*, 341 B.R. 298, 316 (B.A.P. 10th Cir. 2006)) ("[T]he court does need some evidence, whether it be formal projections, or otherwise, to explain how those balloon payments are to be reasonably funded.").

In a § 1129 analysis, a liquidation and a sale are different. *See Landing Assocs.*, 157 B.R. at 820 ("Refinancing or sale does not mean 'reorganization' or 'liquidation' as those terms are used in the Bankruptcy Code."). A plan is not feasible if liquidation is the likely end-result, but a plan can still be feasible if the plan ends in a sale. Courts realize that it is too onerous to require a debtor to name a specific buyer or refinancier at the end of the balloon period but still want assurance that there will very well be a buyer willing to part with enough cash to protect the creditor. *See Bastankhah*, 2012 Bankr. LEXIS 256, at *6 ("[A] debtor must only offer 'some proof that funds will be available at the time the balloon payment is due.'") (interpreting and citing *Am. Trailer & Storage*, 419 B.R. at 430). This typically takes place with relatively generic, stable, enduring assets and not with unique, depreciating, and/or fiscally frenetic ones; and this is a highly factually sensitive finding. *Compare In re Club Assocs.*, 107 B.R. 385, 398 (Bankr.

---

*Briscoe Enters.*, 994 F.2d at 1169.

[16]However, a liquidation can be acceptable if it is represented and contemplated in the plan as such. *See T-H New Orleans*, 116 F.3d at 802.

N.D. Ga. 1989) (court found that apartment complex would likely hold value), *with Lakeside Global*, 116 B.R. at 509 (court could not find that massive apartment complex would hold value in volatile Houston real estate market). Courts should not shift the real risk of an asset's value volatility onto a creditor who will be left holding the keys in the event of liquidation. *See In re Premiere Network Servs., Inc.*, No. 04-33402, 2005 Bankr. LEXIS 2298, at *17-18 (Bankr. N.D. Tex. July 1, 2005) ("Courts are typically reluctant to confirm a plan that shifts risk to the claimants."); *In re Swiftco, Inc.*, No. 85-07083, 1988 Bankr. LEXIS 2251, at *23 (Bankr. S.D. Tex. Oct. 5, 1988) (debtor attempted to convince court that apartment complex would rise in value in time to fulfill two-year balloon payment) ("This court does not require that a buyer or lender be currently available and willing to undertake the future transaction. However, the debtor failed to show that there is a market of possible buyers or financiers anywhere who would even consider buying or financing the apartment project under any conditions. That a sale or refinancing will occur as promised is therefore speculative. If no sale or refinancing occurs, the property is simply to be returned to the lienholder, a result that this court cannot prospectively ratify. Such an act would essentially allow the foreclosure to proceed in 1991 when it was stayed by the filing of the petition in 1985.").[17]

### B. Defining Lone Star's Claim

Lone Star is the only objecting party and is by far the largest creditor in the case, holding the largest secured claim. The Court must define Lone Star's claim before it can directly address feasibility and whether the proposed treatment of Lone Star is fair and equitable.

---

[17]This analysis bleeds into the "fair and equitable" prong of §1129(b)—but courts weave the two together. This makes sense to a degree: if a plan is not feasible it is not fair.

### 1. Contentions of the Parties

The Debtors, relying on Lone Star's proofs of claims, contend that Lone Star's claims are fully secured, but *not* oversecured. The cross-collateralization and cross-default provisions of Lone Star's loans are assumed valid. The Plan, as described above, divides the aggregate Lone Star debt, determined as of the petition date, into two loans—one secured primarily by real property and one secured primarily by the personal property collateral—and proposes a payout of the two loans under the restructured terms. It is critical to the Plan that Lone Star's claims be set in the amount owing as of the petition date. In addition, the Debtors assert that the value of Lone Star's collateral does *not exceed* the claim amount and thus does not trigger a right on Lone Star's part to charge post-petition interest and attorneys' fees. The ratio of debt to collateral is basically 1:1, according to the Debtors.

Lone Star, on the other hand, established at trial that the total value of its hard collateral—not counting the cash components of cash on hand and accounts receivable—is less than its aggregate debt, but, despite that, contends it can allocate collateral either arbitrarily within each entity, PCA or FLCA, or by agreement between FLCA and PCA as sister companies in a way that makes a claim (or claims) effectively oversecured and thereby creating equity for the accrual of interest and fees. They specifically contend that, as a result, the $1.463 million FLCA claim filed in the LLC case is oversecured because the dairy, which secures such loan, has a value of at least $3.38 million. Lone Star submits this is appropriate despite the fact that the dairy also secures Lone Star's *prior* loans that make-up their claim in the Geijsels' individual bankruptcy case.

The Committee, in alliance with the Debtors, submits that Lone Star is in an oversecured position after credit is given for accumulated cash on hand and the $50,000 per month adequate

protection payments. *See* Committee's Brief [Docket No. 742]. The Committee employs a three-step analysis in reaching this result. It first looks at Lone Star's claims as of the petition date relative to the value of its collateral on or around that date. The Committee uses the values for Lone Star's collateral according to Lone Star's experts. Lone Star's claim as of the petition date was $9,774,086.90; the value of its collateral—the real estate, cows, equipment, inventory, receivables, etc.—was $8,595,313.26. Lone Star was therefore undersecured by the difference of $1,178,773.64 on the petition date. Next, the Committee factors in the increased cash accumulated by the Debtors during the bankruptcy case, pointing out that, as of December 31, 2011, it had increased by $665,000, which amount is thereby added to the value of Lone Star's collateral. With other relatively minor changes regarding the value of Lone Star's hard collateral, the aggregate value of Lone Star's collateral thus increased during the pendency of the case to $9,477,090.71. Its unsecured position is thereby significantly reduced in light of its $9,774,086.90 claim amount. Then, the Committee's third step takes into account the adequate protection payments of $50,000 per month made by the Debtors to Lone Star during the pendency of the case. As Lone Star's collateral position did not deteriorate in any meaningful way during the pendency of the case, the Committee simply applies the adequate protection payments on a pro rata basis—55% to the PCA claim and 45% to the FLCA claims—to Lone Star's petition-date debt, thereby reducing such debt by the total amount of the aggregate protection payments, which the Committee submits is $950,000. Lone Star therefore emerges at the time of confirmation as an oversecured creditor, with a claim amount of approximately $8.824 million, secured by property of a value of $9.477 million.

## 2. *T-H New Orleans'* Analysis

The Committee's basic analysis is the correct one as it is consistent with the Fifth

Circuit's directives in *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790 (5th Cir. 1997). The

Court therefore rejects Lone Star's approach.[18] *T-H New Orleans* concerned a secured creditor

that received cash collateral payments that reduced the creditor's allowed claim and, as a result,

caused the creditor to become oversecured. The Circuit addressed two questions: first, whether

the secured creditor was entitled to accrue interest under § 506(b), and, second, if it can, when

does interest begin to accrue and to what extent is the creditor entitled to *postpetition* interest?

The Circuit first looked at § 506(b) and noted that the Supreme Court's opinion in *U.S. v. Ron*

*Pair Enters., Inc.*, 489 U.S. 235 (1989), "made clear that under § 506(b) a creditor is

unqualifiedly entitled to postpetition interest on its oversecured claim." *T-H New Orleans*, 116

F.3d at 797. The Circuit emphasized, however, that § 506(b) applies only from the petition date

---

[18]The Court will briefly address Lone Star's contention that it can, through an in-house allocation of collateral, effectively create an oversecured claim. This is distinguishable from the Committee's analysis that makes Lone Star an oversecured creditor upon a comparison of its *aggregate* claims (all notes in both cases) against *all* collateral. Lone Star's analysis is based upon its contention that it can allocate collateral to make a particular claim, specifically the $1.463 million claim, oversecured. This is, in the Court's view, inappropriate. The Court's analysis is required by the Code and, as stated, begins with the notion that applicable claims in bankruptcy must be determined as of the petition date. As of such date, Lone Star was arguably undersecured. Had it been paid all that it was entitled on such date, it would have been paid an amount that equates the total value of its collateral. Its unsecured claim would have then shared with other unsecured creditors on a pro rata basis from the balance of unencumbered assets, if any, of the estate. Lone Star's claim in the LLC case would not have been paid interest and fees because, obviously, no interest and fees would have accrued. The purpose of § 506 of the Bankruptcy Code in providing the rule for determination of secured claims is, in large part, to protect the creditor's interest in the property securing its claim; it is not to protect something more than that. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988). Such provision also has the intended effect of identifying the manner in which the estate's assets are allocated as between secured and unsecured creditors. *See id.* Very simply, secured creditors do not, as a general rule, get to add to their *secured* claim a sum that exceeds the value of their collateral because, to do so, would be at the expense of unsecured creditors. The vast majority of bankruptcy cases do not have sufficient assets to pay all creditors in full. The Code addresses this reality and imposes rules regarding the priorities of and distributions to all creditors. Were the Court to recognize a right on Lone Star's part to, in effect, do an in-house allocation of collateral away from senior debt to a related junior debt, the equitable distribution scheme required by the Bankruptcy Code would be undermined. Lone Star's claims are all connected by cross-collateralization and cross-default provisions, which tie all loans within each entity and loans across the entities. If allowed to allocate collateral as they wish, it would, in effect, through the course of the bankruptcy proceedings, create a rising unsecured claim, i.e., a claim that is not determined as of the petition date. At least for purposes of confirmation of the Plan here, the Court will not allow it.

to the confirmation date. It instructed that a "creditor's entitlement to postpetition interest is clearly predicated on the threshold establishment of the two values to be compared, that of the property and the claim." *Id.* If the creditor becomes oversecured during the course of the bankruptcy proceedings, the bankruptcy court must determine "when valuation should occur for purposes of determining a creditor's entitlement to postpetition interest." *Id.* On this point, the *T-H New Orleans* panel, recognizing that though § 506 provides some guidance concerning the valuation of a creditor's collateral—i.e., that it is to be made in light of the purposes of the valuation—it does not define or establish the time for determining valuation of collateral for purposes of § 506(b). *Id.* at 798. The court therefore held as follows:

> [W]e conclude that for purposes of determining whether a creditor is entitled to accrue interest under § 506(b) in the circumstance where the collateral's value is increasing and/or the creditor's allowed claim has been or is being reduced by cash collateral payments, such that at some point in time prior to confirmation of the debtor's plan the creditor may become oversecured, valuation of the collateral and the creditor's claim should be flexible and not limited to a single point in time, such as the petition date or confirmation date. We further hold that, notwithstanding the bankruptcy court's determination of a creditor's secured status as of the petition date . . . the *party* who contends that there is a dispute as to whether a creditor is entitled to interest under § 506(b) must motion the bankruptcy court to make such a determination. The creditor though bears the ultimate burden to prove by a preponderance of evidence its entitlement to postpetition interest, that is, that its claim was oversecured, to what extent, and for what period of time.

*Id.* The court further emphasized that its approach recognized the fact that a creditor's allowed claim, if being reduced during the bankruptcy, may be entitled to accrue postpetition interest and that the Bankruptcy Code, specifically § 506(b), does not limit such right. Such approach "recognizes that any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, and not to the debtor." *Id.*

Having resolved the issue of the creditor's right to accrue interest and the *timing of valuation*, *T-H New Orleans* then addressed the timing of when accrual is proper and the extent

to which a creditor is entitled to accrue interest under § 506(b). The court characterized this question as "relatively straightforward," holding that "a secured creditor's entitlement to accrue interest under § 506(b) matures at that point in time where the creditor's claim becomes oversecured." *Id.* at 799. The court then, relying on *In re Timbers of Inwood Forest Assoc., Ltd.*, 793 F.2d 1380 (5th Cir.1986), *on reh'g*, 808 F.2d 363 (5th Cir.1987 (en banc court reinstating panel opinion)), *aff'd*, 484 U.S. 365 (1988) [hereinafter referred to as "*In re Timbers*"], stated that accrued interest under § 506 is not *paid* to an oversecured creditor until the plan's confirmation or its effective date, whichever is later. The Circuit rejected the creditor's argument that it was entitled to the accrual of postpetition interest during the entire postpetition, preconfirmation period, stating as follows:

> The Supreme Court has made it clear that an oversecured creditor is entitled to postpetition interest on its claim only "to the extent that such interest, when added to the principal amount of the claim, [does not] exceed the value of the collateral." *Timbers*, 484 U.S. at 372 . . . . Thus, the amount of interest allowed under § 506(b) is limited to that amount of interest which, when added to the amount of [the creditor's] allowed claim, will not exceed the value of its collateral.

*T-H New Orleans*, 116 F.3d at 799.

### 3. Effect of Cash Collateral and Adequate Protection Payments on Claims

There is no dispute that the aggregate amount of Lone Star's claims as of the petition date is approximately $9.77 million. There is little dispute regarding the value of its collateral. The Court concludes that the value of the hard collateral (less cash and accounts receivable), as of the petition date, was $8,097,391. Lone Star, by its own valuations, was undersecured as of the petition date. There are, however, two variables in this case that complicate the analysis. First, the very nature of the collateral here is such that its value has some degree of volatility, which results from the general volatility of the dairy industry. The second variable concerns the cash,

or, in bankruptcy parlance, the "cash collateral," generated post-petition by the Debtors'
operations. This latter variable is of great significance. The parties do not dispute that the cash
generated during the pendency of the case is subject to Lone Star's lien. The Committee
correctly analyzes this to provide that Lone Star's collateral position improved by the increase in
the accumulated cash. The Committee submits that the correct amount of the improvement is
$665,000, which is the cash balance as of December, 2011, less the cash on hand at the petition
date.

The other cash component of the analysis, as the Committee correctly notes, is the
$50,000 per month adequate protection payments which, as of the culmination of the
confirmation hearing, actually exceeded $1 million.

Resolving how to factor and apply the adequate protection payments is directly tied to the
first variable—the value volatility of the very collateral the adequate protection payments were
intended to protect. Fortunately the evidence simplifies this point as it reveals that while the
land, cattle, equipment, inventory, and any other "hard" collateral may fluctuate in light of the
market, the fluctuations here offset in a way that resulted in the aggregate collateral value of the
hard collateral remaining generally stable. In short, the so-called adequate protection payments
were, in a sense, unnecessary.[19] So, the question emerges, how should the adequate protection
payments be treated given such protection proved unnecessary? This question is resolved by the

---

[19]The purpose of adequate protection payments is to adequately protect creditors from the diminution of value
in a creditor's collateral. *See In re Timbers*, 793 F.2d at 1389 ("adequate protection . . . [is] intended to protect a secured
creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the
stay.") They are not meant to be interest payments, insurance against a plan falling apart, or anything but tangible
protections against the depreciation of a creditor's collateral. *See Timbers*, 484 U.S. at 371. The proper time-span for
assessing whether collateral has declined is from the date of the filing until the Court's ruling disposing of the case. *See,
e.g., In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 57 (Bankr. N.D.N.Y. 1992) ("The interest in property
sought to be protected under Code § 361 is the value of the secured creditor's collateral during the interim period
between the filing of the petition and confirmation of a plan of reorganization, or dismissal of the case.").

simple fact that the income generated during the case that, in turn, was used by the Debtors to make the adequate protection payments was likewise "cash collateral." *See* 11 U.S.C. §§ 552 and 363(a).[20] As such, payments must therefore be applied to Lone Star's claims as measured at the time of the filing. While this conclusion appears obvious to the Court given the facts here, the question of how to apply adequate protection payments made from encumbered cash is not without dispute.

Some courts have stated that when post-petition cash collateral is used as unneeded adequate protection, such payments should be applied to reduce the *secured portion* of a creditor's claim. *See In re Spacek*, 112 B.R. 162, 165 (Bankr. W.D. Tex. 1990); *Confederation Life Ins. Co. v. Beau Rivage Ltd.*, 126 B.R. 632, 640 (N.D. Ga. 1991); *In re Mullen*, 172 B.R. 473, 478-79 (Bankr. D. Mass. 1994); *In re Kalian*, 169 B.R. 503, 505 (Bankr. D.R.I. 1994); *In re Reddington/Sunarrow Ltd. P'ship*, 119 B.R. 809, 813 (Bankr. D.N.M. 1990). The logic behind this position, labeled the "subtraction" view, is that creditors should get "nothing more and nothing less" than their allowed claim. *Spacek*, 112 B.R. at 165. If a creditor is allowed to retain their entire secured claim while still being paid from collateral, these courts note, that creditor will be receiving more than the secured creditor deserves. The *Reddington* court stated as follows:

> [The creditor's] collateral is not depreciating yet it alleges that the payments of rent received pursuant to the cash collateral order only provide adequate protection and should not go towards reduction of its allowed secured claim. Whether the allegation is that the payments are adequate protection payments, interest payments, or lost

---

[20]Income derived from the Debtors' operations is proceeds or profits of Lone Star's collateral. A creditor's collateral may increase in value during the pendency of the case or its collateral may simply increase from "proceeds, products, offspring, or profits" of its pre-petition collateral. The question may be posed, however, whether an increase in collateral from proceeds, etc. results in an increase in the *total* value of the creditor's collateral. The value of pre-petition collateral may, at least in part, be derived from the potential proceeds (or the like) that such underlying collateral generates. All interested parties here—the Debtors, Lone Star, and the Committee—submit that Lone Star's collateral position increased dollar for dollar by the net income generated during the case, however.

opportunity costs, the Supreme Court in *Timbers* made it clear that an undersecured creditor whose collateral is not depreciating is not entitled to such payments.

*Reddington*, 119 B.R. at 813; *see also In re Timbers*, 793 F.2d at 1414-1415 ("The *actual bargain* struck, incorporating the interest provisions of the Code and nearly two centuries of its predecessors, is that if the creditor is undercollateralized when the time comes to 'carve up the bird,' the creditor will receive in respect of the secured portion of its debt only its 'allowed secured claim'; it will not receive interest unmatured at the date of the bankruptcy filing."). Simply put, these courts reason that once a creditor's collateral is used to pay a claim, it is only fair that this use of collateral be credited against its secured claim. *See Reddington*, 119 B.R. at 813 ("In *Timbers*, the [Supreme] Court was concerned that an undersecured creditor not improve its position with respect to other creditors. . . . If payments are made to an undersecured creditor, they must be allowed to reduce the allowed secured claim of the creditor. Otherwise the payments would be treated as interest payments or use value, in direct contravention of *Timbers* and § 506.").

The majority of courts addressing this question have adopted the so-called "addition" view. By interpreting *Timbers*, along with § 552 of the Bankruptcy Code, such courts conclude that unnecessary adequate protection payments made from post-petition cash collateral (whether rents or proceeds) should be applied against a creditor's principal debt, leaving the amount of its secured debt otherwise unaltered. *See 3 Collier on Bankruptcy* ¶ 361.03[2][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011) ("[T]he better view, the 'addition' view [relative to the 'subtraction' view], is that the payments from assigned rents should not be applied to the . . . secured claim. Rather, the payments reduce the creditor's unsecured deficiency claim by satisfying the portion of the claim that is secured by the assignment of [post-petition cash

collateral]. This seems to have become the majority view."); *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 685 (D. Mass. 2000); *In re Gramercy Twins Assocs.*, 187 B.R. 112, 120-121 (Bankr. S.D.N.Y. 1995); *In re Bloomingdale Partners*, 155 B.R. 961 (Bankr. N.D. Ill. 1993); *In re Flagler-at-First Assocs., Ltd.*, 114 B.R. 297 (Bankr. S.D. Fla. 1990); *In re Union Meeting Partners*, 178 B.R. 664, 675-77 (Bankr. E.D. Pa. 1995); *In re Columbia Office Assocs. Ltd. P'ship*, 175 B.R. 199, 202-03 (Bankr. D. Md. 1994); *In re Kain*, 86 B.R. 506, 514 (Bankr. W.D. Mich. 1988) (discussing payments from farm proceeds).

The "addition" view embraces the notion that a creditor should get nothing more or nothing less than it is entitled to under a claim. This view acknowledges that § 552(b) allows a creditor, under narrow circumstances, to retain a security interest in cash or other collateral that the debtor acquires after the filing of the bankruptcy. Thus, a creditor that has an interest preserved by § 552(b) (like Lone Star) is simply entitled to more than one that does not hold such an interest (like the creditor in *Timbers*).

The creditor in *Timbers* was, by using § 362, attempting to collect interest on top of a secured claim from the pot of unsecured money, with the rationale that the creditor took a risk and should be compensated with interest. Both the Fifth Circuit and the Supreme Court rejected this argument. *Timbers* acknowledged, however, that § 552(b) entitles a creditor to additional rights concerning payments made from cash collateral.

> Section 552(a) states the general rule that a prepetition security interest does not reach property acquired by the estate or debtor postpetition. Section 552(b) sets forth an exception, allowing postpetition "proceeds, product, offspring, rents, or profits" of the collateral to be covered only if the security agreement expressly provides for an interest in such property, and the interest has been perfected under "applicable nonbankruptcy law." . . . **Section 552(b) therefore makes possession of a perfected security interest in postpetition rents or profits from collateral a condition of having them applied to satisfying the claim of the secured creditor ahead of the claims of unsecured creditors. Under petitioner's interpretation, however, the**

- 43 -

**undersecured creditor who lacks such a perfected security interest in effect achieves the same result by demanding the "use value" of his collateral under § 362.**

*Timbers*, 484 U.S. at 374 (citations omitted) (emphasis added).

In other words, the Supreme Court did not state that it would be inherently illicit and unfair to allow a secured creditor to collect 'ahead' of another creditor through the application of postpetition cash collateral; but, instead, that there was only one way to do so, which was to meet the narrow exception of § 552(b) instead of invoking § 362 or any other provision of the Code. *See Gramercy Twins*, 187 B.R. at 121 (quoting *Bloomingdale Partners*, 155 B.R. at 976) ("[T]aken together, sections 506(a) and 552(b) require that [the creditor's] post-petition security interest in [cash collateral] be added to its separate security interest in the Property.").

This is not cheating any creditor or abusing the goal of adequate protection; it is, instead, giving a greater-secured-§ 552(b) creditor the benefit of its bargain, a fundamental goal behind plan confirmation and adequate protection payments. *See In re Holliday*, No. 11-62315-13, 2012 Bankr. LEXIS 650, at *8-9 (Bankr. D. Mont. Feb. 23, 2012) (citing *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)) ("The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy."); *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. at 686 (citing Chaim J. Fortgang et al., *Recent Developments in Post-Petition Interest*, SB37 ALI-ABA 255, 279 (1997)) ("[A] secured creditor should benefit from post-petition increases in the value of the property securing the creditor's claim [because] the essence of the bargain between a prospective secured lender and a borrower is the value of the collateral (and potential appreciation thereof) securing the claim."). If a creditor bargained for and received a perfected security interest in post-petition proceeds, then that creditor should not have to subtract this additional, separate collateral already

received from the value of the other collateral remaining as of the effective date of the plan. *See* 3 *Collier on Bankruptcy* ¶ 361.03[2][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011) ("Any payment to the creditor of [cash collateral under 552(b)] is a transfer of its own collateral.").

The majority, or "addition," view is mandated here. It recognizes the potential increase in the value of Lone Star's collateral from the petition date as a result of the income derived from the Debtors' operations. Crediting the adequate protection payments to Lone Star's claim properly implements this approach. The Committee's suggestion that such payments be allocated on a pro rata basis between PCA and FLCA is certainly reasonable.

### 4. Lone Star's Right to Postpetition Interest and Fees

The Committee contends that, as a result of the foregoing analysis, Lone Star is an oversecured creditor. The implication of this, the Committee submits, is favorable to the Debtors' prospects. The Committee fails to account for the evidence before the Court that does allow the Court to determine *when* Lone Star's aggregate claim became fully secured. From the evidence, the Court can easily conclude that Lone Star became oversecured in the course of the bankruptcy proceedings. This assumes, of course, Lone Star's claim amount as of the petition date of $9,774,086.90. Employing essentially the same methodology as did the Committee, the Court can determine that Lone Star became oversecured in early 2011, specifically February, 2011. From the evidence, the Court can set a value of the hard—i.e., the non-cash—collateral. Such collateral consists of the 626.7-acre dairy facility, the 77-acre heifer ranch, the cows, the equipment, and the inventory. From the Debtors' monthly operating reports, the Court can determine the cash on hand at the end of each month and the accounts receivable for each month. Assuming a static value for the hard collateral, which assumption construes in the Debtors'

favor, and adjusting the collateral value by adding the cash and accounts receivable for each month, the Court can ascertain the resulting total collateral at the end of each month. Then, having determined that the adequate protection payments are best applied to the claim amount, a declining balance of $50,000 per month results. Comparing the total collateral value against the declining claim amount allows the Court to determine when and to what extent Lone Star became oversecured. A chart reflecting the foregoing information is set forth on an addendum to this Memorandum Opinion. A simple comparison of the two numbers for any month reveals a snapshot of Lone Star's position and whether it was undersecured or oversecured at that time. Of course, given the volatility of the dairy industry and the impact of the many other factors that influence dairy prices and values, a snapshot approach is arguably too simplistic. The Court therefore applies this same approach for the entirety of the proceedings. From this, the Court can discern that not only did Lone Star go from undersecured to oversecured in February 2011, it remained oversecured during the balance of the proceedings thereafter. While, on one level, this might be a tribute to the Debtors' operations, it is also a circumstance that triggered Lone Star's right to interest and fees postpetition. *See* 11 U.S.C. § 506(b).[21] It also identifies the time at which Lone Star gained the right to accrue interest.

The contract interest rates for the PCA notes range from a default rate of 9.25% on Loan Nos. 259100177 ($2,900,453.83) and 259100178 ($2,196,043.11), to regular contract rates of 4.29% and 6.45% on Loan Nos. 259100277 ($31,265.95) and 259100383 ($128,823.45), respectively. For FLCA's notes, the rates are 3.72% on Loan No. 477730 ($134,283.73), 3.76%

---

[21] "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b).

on Loan No. 858175 ($278,027.30), 5.95% on Loan No. 876408 ($2,695,347.66), and 5.50% on Loan No. 885689 ($1,407,341.58). *See* Lone Star's Exhibits 50-51 (Proofs of Claim Nos. 38-1 and 39-1 in Case No. 10-43979) and Lone Star's Exhibit 52 (Proof of Claim No. 16-1 in Case No. 10-43980).

As is apparent, the higher rates are on the larger notes and balances. Applying a simple 5.25% rate across the board (and thus ignoring the 4% added default rate), the Court can easily infer that Lone Star's interest from March 2011 to present is at least $39,000 per month.[22]

Lone Star is also entitled to charge reasonable attorneys' fees; both the documents between the parties and § 506 so allow. *See* 11 U.S.C. § 506(b).[23] *T-H New Orleans* does not specifically address attorneys' fees, but the Court, noting that fees are included along with interest in § 506(b),[24] assumes for purposes of the analysis that fees are, like interest, chargeable from the point in time Lone Star became oversecured. The Court can obviously assume that the fees are substantial and are greater than $500,000. *See supra* Finding ¶ 53.

The point of the foregoing analysis is that, as of any proposed confirmation date—February 3, 2012, at the conclusion of the confirmation hearing, or as of the date of this Memorandum Opinion—Lone Star's interest and fees absorb any cash "cushion" the Debtors

---

[22]This is derived from the following calculation: 5.25% x average principal balance of $8,924,086.90 / 12 = $39,042.88.

[23] *See supra* note 21.

[24] *See id*.

gained during the course of the bankruptcy proceedings.[25] This means, further, that Lone Star's claim attaches to the funds on hand.[26]

### C. Is the Plan Confirmable?

#### 1. Use of Encumbered Cash for Plan Payments

Under the Plan, the Debtors are required to make their first payment of at least $246,396.00. *See* Debtors' Exhibit 14-C. This includes $35,630.56 for administrative claims, which payments continue monthly for at least one year as a means to pay the accumulated professional fees (principally for the Debtors' counsel). The first payment contemplates the first aggregate monthly payment to Lone Star of $82,661.82 ($56,660.03 on the PCA claim and $26,001.79 on the FLCA claim). It includes the payment to other secured creditors—Black Tulip, AgriCredit, Ford Credit, John Deere Credit, Southern Farm Bureau, Kubota Credit, and Volvo Financial—who each likewise receive regular monthly payments (the total of these monthly installments is approximately $7,336.00). Regular payments under the Plan are made to unsecured creditors (with claims greater than $1,500) of $10,555.50. The total claims of such creditors is stated at $583,822.88. The other payments, which are one-time payments—one of relative significance, the other not—are also provided for. The less significant is the payment of $8,869.21 for convenience class creditors with claims of less than $1,500 who receive a one-time payment. This payment is made in the third month after the effective date of the Plan. The more

---

[25]This is an imprecise science. The value of property at any point in time is, at best, based on an educated guess. Obviously the value of "cash" collateral is an exception to this observation. But here the amount of cash, and hence its value, fluctuated monthly, if not weekly or daily. The Debtors' inventory and accounts receivable likewise fluctuate monthly. The Court must, by necessity, have some flexibility in addressing the value of floating collateral. The collateral here could potentially float up and down. Regardless of the Court's ability to "pinpoint" a value for all purposes and relevant times, it can fairly conclude that Lone Star's liens encumber the Debtors' cash and that, at any point in time, Lone Star's claim is greater than the value of Lone Star's collateral, or, with accrued interest and added fees, the claim exhausts the collateral value at all relevant times during the bankruptcy proceedings.

[26]The cushion eroded as well from the deterioration of the Debtors' cash position. *See supra* Finding ¶ 54.

significant payment is for priority claims, labeled as § 503(b)(9) (or reclamation) claims, in the amount of $110,212.26. This payment is required to be made upon the effective date of the Plan. These latter one-time payments obviously increase the regular plan payment by the amount of the payments. After the priority claims and convenience class creditors are paid, the Plan payments are projected to be approximately $136,184 per month for the first year. Once the attorneys' fees, i.e., the administrative claims, are paid, the payments drop by another $35,630.56 per month, which is anticipated to occur in the second year of the Plan.

The Plan is premised upon the Debtors having over $1 million cash on hand, which arguably creates a sufficient "cushion" to thereby allow its use to make payments required by the Plan without jeopardizing Lone Star's collateral position. The problem is that the Debtors' cash position is much less and, perhaps more important, Lone Star's lien attaches to the cash. The Debtors simply do not have the cushion they projected; they, in fact, have no cushion.

The Debtors have already used cash collateral during the pendency of the case. A debtor may spend encumbered cash during the pendency of the case, either for the maintenance of the case or with the consent of the creditor. *See In re River Oaks Ltd. P'ship*, 166 B.R. 94, 100 (E.D. Mich. 1994). Here, Lone Star, through a cash collateral agreement, consented to the Debtors' use of cash collateral during the pendency of the case for the continued and future maintenance of the estate's assets; Lone Star also consented to the Debtors escrowing $35,000 per month for administrative fees. Lone Star agreed to the adequate protection payments of $50,000 per month to protect its interest in its hard collateral.

The cash collateral order specifically provided that any preconfirmation payments to unsecured creditors in this case, including reclamation creditors, had to either be approved by the

Court or consented to by Lone Star. Lone Star, as an objecting party, has clearly *not* consented to the use of cash collateral *under the Plan*.

## 2. Does the Plan satisfy the fair and equitable standard—§ 1129(b)?

The use of the encumbered cash under the Plan implicates, as to Lone Star, the fair and equitable standard of § 1129(b). The treatment of Lone Star as an impaired and dissenting creditor must be "fair and equitable." *See* 11 U.S.C. § 1129(b). A debtor's plan may meet this standard by providing that the dissenting secured creditor retains its liens and is paid in deferred payments an amount that equates to the present value of the secured creditor's claim. *See* § 1129(b)(2)(A). The Debtors are not proposing to use the encumbered cash to fund maintenance or upkeep on the property going forward, but instead propose to transfer Lone Star's collateral to pay other prepetition claims and administrative claims. Using a creditor's collateral to make payments to *other* creditors is problematic. *See In re Griswold Bldg., LLC*, 420 B.R. 666, 705-06 (Bankr. E.D. Mich. 2009) (denying debtor's plan because it proposed to pay administrative fees with secured creditor's cash collateral before the secured creditor was paid). The *Griswold* court stated as follows:

> The Debtors are not proposing to use the . . . cash that has accumulated in the lockbox during the Chapter 11 case to make improvements [to their secured property], . . . which would enhance the value of the properties going forward. Nor are they proposing to take [the cash] and pay them to the Lender . . . . Instead, the Debtors propose to use the Lender's cash collateral to pay claims that have a lower priority under the Bankruptcy Code than the claims of the Lender, without providing any replacement collateral for the Lender. It is hard to see how that is fair and equitable.

*Id.*

The Plan fails to accord Lone Star the "indubitable equivalent" of its cash collateral. *Id.* at 700-01. The Debtors' assurances that Lone Star will be paid in full under the Plan and that the

Debtors will continue to honor their security agreements with Lone Star regarding future cash are not an "indubitable equivalent." *See id.* ("The Debtors are not proposing any replacement collateral or other indubitable equivalent for their spending [to pay unsecured and administrative claims] of the $1,588,000.00 of [secured creditor's cash collateral] they have collected, but are simply proposing to pay these funds back in a balloon payment, five years from confirmation."); *In re Smithville Crossing, LLC*, No. 11-02573-8, 2011 Bankr. LEXIS 4605, at *30-31 (Bankr. E.D.N.C. Sept. 28, 2011) (citing *Griswold*, 420 B.R. at 699) ("If the debtor seeks to use the secured party's collateral post-confirmation to fund its plan then the debtor must provide the secured party with the collateral's 'indubitable equivalent.' . . . Virtually every case addressing this issue has held that the proffer of a replacement lien on post-petition rents is illusory by virtue of § 552(b) of the Bankruptcy Code."); *Cf. In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558, 566 (B.A.P. 6th Cir. 2010) (quoting *River Oaks Ltd. P'ship*, 166 B.R. at 99) (cases dealing with a § 363 motion).[27] The Debtors are unable to provide adequate assurance here.

Given the circumstances here, particularly the nature and extent of Lone Star's claims, this case presented a difficult hurdle for the Debtors. They have no equity and no outside financing. Their personal and corporate lives are completely tangled and encumbered. They are not analogous to debtors in other cases where courts have approved plans that called for the use of cash collateral to help fund the plan. *See In re Dindiyal*, No. 892-80432-478, 1993 Bankr.

---

[27]The *River Oaks* court held as follows:

> Where . . . there is a specific assignment of [cash collateral] given as security, a diversion of any portion of the [cash] to a party other [than] the secured party is clearly a diminution of the secured party's interests in the assignment of [the cash] portion of the security . . . . The secured party has a security interest in the full amount of the future rents. Therefore, this court cannot accept that the use of future [cash] to replace the expenditure of the prior months rents somehow provides adequate protection for the secured party.

*River Oaks Ltd. P'ship*, 166 B.R. at 99.

LEXIS 1832, at *13-23 (Bankr. E.D.N.Y. Sept. 30, 1993) (court avoided fair and equitable analysis where debtor proposed to pay unsecured creditors with other creditor's cash collateral because it saw no real harm to the secured creditor in having debtor spend its cash collateral; the creditor had a significant equity cushion and its secured position was not truly threatened); *see also In re Seasons Partners, LLC*, 439 B.R. 505, 521 (Bankr. D. Ariz. 2010) (court found that a debtor could use a creditor's cash collateral to fund a plan when a third-party hedge fund planned to pay the creditor more than the amount of cash collateral that the debtor held as of the effective date of the plan); *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 482-83 (Bankr. S.D. Ohio 2011) (citing *Griswold*, 420 B.R. at 706) (court, doubtful that debtors could use cash collateral under the plan, was able to avoid addressing the issue because the junior claims had already been paid pursuant to a cash collateral order). Here, however, there is no equity and the Debtors propose to use cash generated during the case to pay-off junior, unsecured, and administrative claims, either on the effective date or shortly after, without providing additional security to Lone Star. The Plan also contemplates payments to a so-labeled secured creditor, Black Tulip, which holds a lien that is junior to Lone Star's on property with little to no value beyond the Lone Star debt.

The Debtors have proposed no means of compensating Lone Star for Lone Star's potential loss of collateral (the cash) except for the prospect that the Plan will work-out in the end. A court cannot so ignore the rights of a secured creditor. *See In re O.P. Held, Inc.*, 74 B.R. 777, 784 (Bankr. N.D.N.Y. 1987).

The Debtors may not use Lone Star's cash collateral to fund the Plan as proposed here. The Plan's treatment of Lone Star does not satisfy the "fair and equitable" standard of § 1129(b).

### 3. Is the Plan feasibile—§ 1129(a)(11)?

To reiterate from the discussion at Part II-A-2, the general standard for confirmation is whether the plan has a reasonable possibility of success within a reasonable period of time. It is particularly important that a *secured creditor* be protected. This is no doubt tied to the constitutional ramifications raised when a secured creditor's interest in property is affected. *See U.S. v. Richie Special Credit Invs., Ltd.*, 620 F.3d 824, 835 (8th Cir. 2010) (citing *In re Townley*, 256 B.R. 697, 700 (D.N.J. 2000)) ("The right of a secured creditor to the value of its collateral is a property right protected by the Fifth Amendment."). It can even be argued that some leeway be provided regarding a debtor's prospects so long as the secured creditors are protected. The fundamental problem here, however, is that the Debtors' cash position is much less than projected and even that which is available is encumbered by Lone Star's liens. Using the encumbered cash to pay professionals and other creditors not only runs afoul of the fair and equitable standard of § 1129(b), it also fails to accord Lone Star its constitutionally protected right in its collateral. Were the Court to approve confirmation and thus allow such payments to be made, the risk would be wholly shifted to Lone Star.

The factor-driven analysis of feasibility underscores the Court's conclusion. The dairy industry is highly volatile and fragile. The Debtors' capital structure does not provide them with the buffer needed to weather the storms that are sure to hit.

The Debtors do have the ability to consistently generate revenue on a monthly basis. The problem, of course, is that their expenses fluctuate greatly and their *net* income has fallen well below projections. Their projected gross revenues and thus net revenues cannot be achieved. The pro formas proved to be overly optimistic.

The Plan contemplates balloon payments without a specific plan for payment. The pro formas predicted that at the time of the seven-year balloon of $1,829,529 on the PCA note, the Debtors would have $5.2 million in available cash. The available cash is premised upon a starting cash balance of $1.1 million. The Court obviously cannot conclude that the Debtors will have anything close to $5.2 million at the time of the balloon payment. The concept of a balloon payment is not as problematic as is the assumption that the Debtors' operations will even survive to that point, however. It is nothing more than speculation to consider whether the Debtors can refinance their operations or sell assets as a way to pay-off Lone Star.

With respect to the Geijsels continuing as managers of the dairy, the Court notes that their ability to run a dairy cannot seriously be questioned. They have a deep understanding of all aspects of the dairy operation. They have spent their entire adult lives in the dairy business. They know how to care for the herd and how to maximize its production. The Court is troubled, however, by their failure to appreciate the restrictions imposed on them in return for the credit provided by Lone Star. Their use of operating funds to construct free stalls, not once but twice, contributed to their financial difficulties and in no small part caused Lone Star's distrust of them. During the confirmation hearing, Mr. Geijsel refused to acknowledge the impropriety of the diversion.

With the cushion gone, the Plan is not feasible. The Debtors have no other source of capital; they have no operating funds or line of credit going forward. This stark fact simplifies the feasibility analysis. The Debtors are unable to make the initial payments required by the Plan.

The evidence highlights other issues that impact the feasibility analysis. A few of these are addressed.

- The ten-year amortization on the personal property loan will not maintain the integrity of the value of the collateral relative to the debt: the equipment depreciates faster than the pay-down on the debt.

- The cattle inventory and value have gone down during the latter stages of the case, which, relative to other matters, may appear insignificant and may be easily explained; at the very least, however, it undermines the Debtors' contention that Lone Star's position is sufficiently protected.

- The Debtors' diversion of operating funds prepetition undermines the credibility of their feasibility testimony.

- The overlapping of the confirmation hearing with the period covered by the Debtors' pro formas forced the Court to assess the Debtors' actual performance against their projections. They obviously failed to meet their projections. The drought and heat of the summer of 2011 provided an easy explanation for their inability to meet projections. The Court was, however, left with assessing the Debtors' actual performance in the course of the bankruptcy against the proposed treatment of creditors under the Plan. The Committee, in particular, advocated this approach. After all, the Debtors successfully maintained their operations and were able to pay $85,000 per month while doing so, even during a difficult period occasioned by the weather. While sensitive to this, the Court was also left with nothing more than merely surmising about the Debtors' ability to perform in accordance with the Plan. The pro formas were, apparently, a product of what can only be described as a "team effort." No witness truly owned-up to having prepared the pro formas. It was not clear that any one witness—whether it be either of the Debtors or their expert—could testify to the implications of the pro formas. The pro formas lacked

objectivity. The Geijsels' dairy enterprise is fraught with complexities. The mere consideration of payments made and, perhaps, a review of monthly operating reports cannot substitute for competent expert testimony concerning the Debtors' projected operations.

### III. Conclusion

The Plan does not satisfy the feasibility requirement of § 1129(a)(11) or, as to Lone Star, the fair and equitable standard of § 1129(b) of the Code. The Court must therefore deny confirmation. In reaching this conclusion, it is unnecessary to address the issue of whether the proposed interest rate is appropriate.

In light of the findings and conclusions made by the Court in this Memorandum Opinion, the Court further concludes that Lone Star's motion for relief from stay [Docket No. 183] should be granted. The Plan is not confirmable; the Debtors do not have any equity in the property securing Lone Star's claims and the property is not necessary to an effective reorganization. *See* 11 U.S.C. § 362(d)(2). There is no "reasonable possibility of a successful reorganization within a reasonable time." *Timbers*, 484 U.S. at 376.

The Court denies Lone Star's motion seeking appointment of a chapter 11 trustee or to dismiss [Docket No. 304] and the Debtors' motion to designate Lone Star's votes [Docket No. 578]. The motion to determine Lone Star's secured claim [Docket No. 433] is resolved by the Court's conclusion that the Debtors' cash on hand secures Lone Star's debt, including properly accrued interest and allowable attorneys' fees and costs.

Lone Star's counsel shall submit for entry the following orders:

(1) an order denying confirmation of the Plan;

(2) an order granting relief from the automatic stay;

(3) an order denying (as moot) Lone Star's motion to appoint a chapter 11 trustee or to

dismiss;

(4) an order denying the Debtors' motion to designate;

(5) an order on the Debtors' motion to determine the value of Lone Star's secured claim.

### End of Memorandum Opinion ###

# ADDENDUM TO MEMORANDUM OPINION

| Month | Value of hard (non-cash) collateral @ filing[1] | Cash on hand @ end of month | Accounts Receivable[2] | Collateral value @ end of month[3] | Adequate Protecton Payments (to Principal) | Declining Principal Balance | Lone Star's initial claim amount = $9,774,086.90 |
|---|---|---|---|---|---|---|---|
| Jun-10 | $ 8,097,391.00 | $ 324,579.99 | $ 260,606.07 | $ 8,682,577.06 | $ 50,000.00 | $ 9,724,086.90 | |
| Jul-10 | $ 8,097,391.00 | $ 325,624.59 | $ 276,158.81 | $ 8,699,174.40 | $ 50,000.00 | $ 9,674,086.90 | |
| Aug-10 | $ 8,097,391.00 | $ 371,710.99 | $ 291,007.76 | $ 8,760,109.75 | $ 50,000.00 | $ 9,624,086.90 | |
| Sep-10 | $ 8,097,391.00 | $ 448,296.76 | $ 315,291.87 | $ 8,860,979.63 | $ 50,000.00 | $ 9,574,086.90 | |
| Oct-10 | $ 8,097,391.00 | $ 618,933.54 | $ 380,186.48 | $ 9,096,511.02 | $ 50,000.00 | $ 9,524,086.90 | |
| Nov-10 | $ 8,097,391.00 | $ 648,566.98 | $ 348,476.73 | $ 9,094,434.71 | $ 50,000.00 | $ 9,474,086.90 | |
| Dec-10 | $ 8,097,391.00 | $ 613,167.27 | $ 361,424.79 | $ 9,071,983.06 | $ 50,000.00 | $ 9,424,086.90 | |
| Jan-11 | $ 8,097,391.00 | $ 670,986.36 | $ 411,420.31 | $ 9,179,797.67 | $ 50,000.00 | $ 9,374,086.90 | |
| **Feb-11** | $ 8,097,391.00 | $ 817,728.08 | $ 413,916.63 | **$ 9,329,035.71** | $ 50,000.00 | **$ 9,324,086.90** | =>Lone Star's collateral value |
| Mar-11 | $ 8,097,391.00 | $ 871,772.62 | $ 513,561.68 | $ 9,482,725.30 | $ 50,000.00 | $ 9,274,086.90 | exceeds principal balance |
| Apr-11 | $ 8,097,391.00 | $ 1,144,195.08 | $ 399,765.85 | $ 9,641,351.93 | $ 50,000.00 | $ 9,224,086.90 | |
| May-11 | $ 8,097,391.00 | $ 1,072,862.30 | $ 445,918.77 | $ 9,616,172.07 | $ 50,000.00 | $ 9,174,086.90 | |
| Jun-11 | $ 8,097,391.00 | $ 1,082,739.07 | $ 432,565.08 | $ 9,612,695.15 | $ 50,000.00 | $ 9,124,086.90 | |
| Jul-11 | $ 8,097,391.00 | $ 1,000,843.50 | $ 405,293.11 | $ 9,503,527.61 | $ 50,000.00 | $ 9,074,086.90 | |
| Aug-11 | $ 8,097,391.00 | $ 1,012,306.20 | $ 414,815.87 | $ 9,524,513.07 | $ 50,000.00 | $ 9,024,086.90 | |
| Sep-11 | $ 8,097,391.00 | $ 989,602.26 | $ 378,320.49 | $ 9,465,313.75 | $ 50,000.00 | $ 8,974,086.90 | |
| Oct-11 | $ 8,097,391.00 | $ 842,083.38 | $ 337,151.04 | $ 9,276,625.42 | $ 50,000.00 | $ 8,924,086.90 | |
| Nov-11 | $ 8,097,391.00 | $ 836,557.55 | $ 349,417.03 | $ 9,283,365.58 | $ 50,000.00 | $ 8,874,086.90 | |
| Dec-11 | $ 8,097,391.00 | $ 659,186.60 | $ 372,817.24 | $ 9,129,394.84 | $ 50,000.00 | $ 8,824,086.90 | |
| Jan-12 | $ 8,097,391.00 | $ 579,130.76 | $ 390,980.38 | $ 9,067,502.14 | $ 50,000.00 | $ 8,774,086.90 | |
| Feb-12 | $ 8,097,391.00 | $ 683,013.43 | $ 291,663.30 | $ 9,072,067.73 | $ 50,000.00 | $ 8,724,086.90 | |
| Mar-12 | $ 8,097,391.00 | $ 555,357.89 | $ 314,132.39 | $ 8,966,881.28 | $ 50,000.00 | $ 8,674,086.90 | |
| Apr-12 | $ 8,097,391.00 | $ 494,295.19 | $ 287,293.91 | $ 8,878,980.10 | $ 50,000.00 | $ 8,624,086.90 | |
| May-12 | $ 8,097,391.00 | $ 442,176.58 | $ 276,196.26 | $ 8,815,763.84 | $ 50,000.00 | $ 8,574,086.90 | |
| Jun-12 | $ 8,097,391.00 | $ 276,442.21 | $ 264,458.79 | $ 8,638,292.00 | $ 50,000.00 | $ 8,524,086.90 | |
| **AVERAGE:** | | $ 695,286.37 | $ 357,313.63 | $ 9,149,990.99 | | $ 8,924,086.90 [4] | |

[1]The hard (non-cash) collateral is all of Lone Star's collateral—real property (the dairy and heifer ranch) and personal property (cows, equipment, inventory)—save for cash (cash on hand) and accounts receivable.

[2]For Accounts Receivable in months June 2010 - May 2012, the figure shown is the amount of Accounts Receivable actually collected in the following month.  For June 2012, the figure shown is the projected Accounts Receivable figure from the Assets section of the June 2012 Monthly Operating Report (the July figure for Accounts Receivable Collections is not yet available).  *See*  Doc #872 at 18.

[3]The collateral value assumes a static value of cattle, equipment, inventory, and land; the value, therefore, adjusts with the cash on hand at end of month and accounts receivable for the month.

[4] The average principal balance is an average of the declining balance from March 2011 ($9,324,086.90) through June 2012 ($8,524,086.90).